FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

97 NOV 14 AM 9:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| VERDELL CRAIG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CV 95-PT-3113-S |
| ) | |
| JEFFERSON COUNTY COMMITTEE FOR ) | **ENTERED** |
| ECONOMIC OPPORTUNITY, ) | |
| ) | NOV 1 4 1997 |
| Defendant. ) | |

## Memorandum Opinion

This cause comes on to be heard on a motion for summary judgment filed by the defendant Jefferson County Committee for Economic Opportunity ("JCCEO") on September 2, 1997. In its motion, the defendant argues that the plaintiff, Verdell Craig ("Craig"), cannot state a claim for sexual harassment or retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., or for breach of contract under Alabama law. On October 28 1997, the court held a phone conference in which it requested the parties submit additional argument on statute of limitations issues.

On a motion for summary judgment, the court must assess the proof to ascertain whether there is a genuine need for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is appropriate only if this court concludes that no genuine issue of material fact exists and that the moving party is entitled

135

to judgment as a matter of law. FED. R. CIV. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial responsibility of informing this court of the grounds for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes prove the absence of a genuine issue of material fact. Id. at 323. Once the moving party has met this burden, the nonmoving party "must produce evidence that shows there exists a genuine issue of material fact." Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing the presence of a genuine issue for trial. Celotex, 477 U.S. at 324. The court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . . " in deciding whether to grant or deny a summary judgment motion. FED. R. CIV. P. 56(c). In resolving whether a given factual dispute requires submission to a jury, the court must view the presented evidence through the prism of the substantive evidentiary burden. Anderson, 477 U.S. at 254-55. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). Considering the above, this court must examine the evidence to determine the existence of genuine issues of material fact as to the various claims.

Facts

The present case stems out of an alleged incident of quid pro quo sexual harassment arising in May 1990. According to Ms. Craig, Gayle Cunningham, the plaintiff's supervisor, allegedly asked the plaintiff "if she had a problem sleeping with a woman." Purportedly, the plaintiff responded that she did have a problem, to which Cunningham allegedly answered that the plaintiff would lose her job.

    On September 28, 1987, the plaintiff was employed by the JCCEO as a teacher's

aide. Starting in February of 1989, the plaintiff received a series of reprimands and suspensions. In February 1989, the plaintiff was reprimanded for excessive and unreported absences from work. In May 1990, at the same time as Cunningham's alleged unwelcome overture, Cunningham suspended the plaintiff from work for unprofessional behavior during a parent conference. On August 13, 1991, the plaintiff received an formal reprimand for noncompliance with procedure, for lack of cooperation with the teacher with whom she was assigned to work and for refusal to acknowledge a conference with her supervisors. On September 17, 1991, Cunningham again suspended the plaintiff for insubordination and willful violation of the JCCEO's policies and procedures. Termination was, at that time, recommended.

On October 11, 1991, the plaintiff was terminated after a full hearing before the JCCEO Policy Council. On November 26, 1991, the plaintiff was reinstated with back pay by the JCCEO Personnel Committee. In December 1991, the plaintiff was suspended, allegedly for attempting to run a bus driver for the JCCEO onto the rail of Interstate 65 South on October 25, 1991. Again, Cunningham recommended suspension of the plaintiff.[1] After a hearing in which the plaintiff presented testimony and documents that she was at the University of Alabama at Birmingham Hospital on October 25, 1991, the plaintiff was reinstated.

On March 5, 1992, Cunningham again suspended the plaintiff, recommending termination, for giving a false account of her location on October 25, 1991 and for not following JCCEO practices and procedures. On March 26, 1992, the plaintiff was afforded a hearing before the JCCEO Policy Council at the conclusion of which the Policy Council voted in favor of terminating the plaintiff. The plaintiff appealed to the JCCEO Personnel Committee, which, on April 21, 1992, voted to uphold the termination. The plaintiff avers that, at some time in March or April of 1992 she was told by the Equal Employment Opportunity Commission that she was required to exhaust her appeal

---

[1] In a later affidavit, the bus driver recanted her description of events, stating that she was told to fabricate the incident by Cunningham in order to give Cunningham an excuse to terminate the plaintiff.

remedies prior to filing a charge.[2] Finally, on June 17, 1992, the JCCEO Board of Directors voted to uphold the termination.

The plaintiff states that she filed a charge with the EEOC on December 2, 1997. However, no evidence of such charge, other than Craig's own statements, exists.[3] The only charge of which this court has evidence was filed with the EEOC on March 24, 1993. Copies of the EEOC Notice of Dismissal and Right to Sue letter issued August 14, 1995 were sent to the plaintiff and her listed attorneys, Rose M. Sanders (an attorney at the firm presently representing the plaintiff) and Katrina Mu'Min. The plaintiff contends that at the time the letters were sent, neither attorney represented her any longer on the matter of her discrimination charge.[4] The plaintiff filed her complaint in this action on December 29, 1995.

## Contentions & Analysis

The defendant contends, first, that the plaintiff failed to file her complaint with the court within ninety days of receipt of the right-to-sue letter by either herself or one of her attorneys. The plaintiff responds that because this court in an earlier order stated that the plaintiff's Title VII claims and state law claims against the JCCEO could proceed, the defendant is barred from raising these issues. The defendant replies that the ninety day limitation on filing is a jurisdictional bar to this court's ability to hear the instant case and jurisdictional matters can be revisited in the court at any time.

In a hearing conducted on August 29, 1996, this court made the following findings of fact and conclusions of law:

> The evidence is that this case or that the EEOC charge had initially been

---

[2] The plaintiff provides no evidence of this conversation other than her own testimony.

[3] Although the plaintiff's attorney informed the court that an EEOC document refers to the March 24, 1997 charge as an amended charge, the court cannot find the document to which the attorney refers.

[4] The EEOC logbook demonstrates, to the contrary, that as late as six days before the right to sue letter was sent, Craig confirmed that Mu'Min was her attorney.

referred to the Birmingham office or being handled by the Birmingham office of the EEOC. That later, that for one reason or another, and I don't know that it's material for me to decide that, . . . a decision was made to refer the matter to the New Orleans office.

The evidence is [that] in a short time after Ms. Craig determined that the matter had been referred to the New Orleans office, contrary to some suggestion that she didn't try to make some minimal effort to find out about some notice of right to sue or ruling on the charge or anything else, she contacted them by phone several times.

The undisputed evidence is that she was advised that it would be a matter of months before there would be any sort of determination made with regard to that pending charge.

The undisputed evidence is that at some point around August of 1995, . . . her sister had cancer, that she went to Detroit to be of assistance to her sister. That during that relatively short time frame, contrary to what has been suggested to her by EEOC in New Orleans, they mailed out a determination letter and a notice of right to sue.

That she had left somebody at home to receive her mail for her, had the notice of right to sue come in, other than being by returned receipt requested where Ms. Craig had to sign for it, that person would have received that mail for her. But at least on one occasion the person that she had left there went to the post office, tried to get it, was told she couldn't get it because she was not a resident of the house.

The evidence also is that the very next day after Ms. Craig returned home that she went to the post office and picked this up.

[S]he wasn't dawdling, as I see it. She made minimal, more than minimal effort. Even after she was in Detroit she had conversations with them concerning her case.

So it strikes me that this is not a situation where she didn't make minimal effort to try to find out where she stood as far as receiving that charge. And even if Ms. Holmes had told her that, well, you got something down there apparently from the EEOC, I don't think it would be reasonable to suggest that with her sister being sick that . . . she immediately had to come home and check on that piece of mail.

And as I understand it, the issue is . . . when did she receive it. Maybe the law ought to be that, well, if you received it on September the 1st, and you could have received it on August the 18th, that still gives you some seventy-five to seventy-eight days or more to file your . . . complaint. In other words, you don't have the full ninety anymore, but you at least have seventy-five. So just in order to avoid any problem whatsoever, why don't you go ahead and file a suit within seventy-five days instead of ninety days.

But as far as I know that is not the way the law reads. The law reads, did she file a suit within ninety days after she received it. And she filed an application in this Court within the ninety days. And the rules of this court, and I think the very forms that we send out, say that this will be considered filed on the date of the filing of the application if you file a complaint within thirty days. . . .

[I]n effect, I am ruling that the Court has jurisdiction of the charge and

-5-

claim. . .

Hearing of August 29, 1996 at 19-23. With regards to whether the plaintiff herself filed within ninety days of receipt of the right to sue, the court has already found that she filed her claim within ninety days of receipt of the letter by her and sees no reason to upset its ruling on that ground. However, there is an additional matter that the defendant has brought to the attention of the court, that the plaintiff's attorney received a copy of the right to sue letter more than ninety days before the complaint was filed. The plaintiff does not in her brief dispute that Ms. Sanders and Ms. Mu'Min received the right to sue letter more than ninety days before suit was filed, but disputes that either represented her at the time the right to sue letter was issued.

That the court sustained a claim in response to an earlier summary judgment motion does not foreclose reconsideration of the issues earlier plumbed in a later motion for summary judgment.

> When a judge denies one party's motion for summary judgment, he merely preserves the status quo in the case. He indicates only that the moving party has not presented a sufficient case to win outright at that point. . . . [B]y its very nature a denial of summary judgment cannot be conclusive.

Smith v. First National Bank of Albany, 735 F.2d 459, 461 (11th Cir. 1984).

> Title VII of the Civil Rights Act of 1964 requires that suit be brought within 90 days after receipt of notice of right to sue. 42 U.S.C. § 2000e-5(f)(1). In Franks v. Bowman Transportation Co., 495 F.2d 398 (5th Cir.1974), reversed on other grounds, 424 U.S. 747 [] (1976), our predecessor circuit stated: "Where . . . it is shown that the claimant through no fault of his own has failed to receive the suit letter, . . . the delivery of the letter to the mailing address cannot be considered to constitute statutory notification." Id. at 405. In Lewis v. Connors Steel Co., 673 F.2d 1240, 1243 (11th Cir.1982), we added that a plaintiff "should not be heard to complain" unless the plaintiff has assumed the minimal "burden of advising the EEOC of address changes or . . . [taken] other reasonable steps to ensure delivery of the notice to his current address." In Bell v. Eagle Motor Lines, Inc., 693 F.2d 1086 (11th Cir.1982), the right-to-sue letter was delivered to plaintiff's address and signed for by his wife on December 18. Plaintiff was out of town and first learned of the letter on December 26. Applying the case-by-case approach suggested in Lewis, the court held that receipt of the letter by plaintiff's wife at the residence triggered the running of the 90-day period, notwithstanding the fact that plaintiff actually learned of the letter some eight days later. The court's rationale was that a plaintiff should not enjoy a manipulable, open-ended time extension which could render the statutory limitation meaningless. See also

> Law v. Hercules, Inc., 713 F.2d 691, 692-93 (11th Cir.1983) (to the same effect).
> Under the law of our circuit, the 90-day statute of limitations commences upon receipt of the right-to-sue letter. However, a plaintiff is required to assume some minimal responsibility to ensure receipt. The court has adopted a case-by-case approach in determining what constitutes receipt and when the time is triggered.

Stalworth v. Wells Fargo Armored Services Corp., 936 F.2d 522, 524 (11th Cir. 1991). Receipt by either the plaintiff or the plaintiff's attorney is sufficient to initiate running of the limitation period. In considering whether receipt of a right-to-sue letter by an attorney commenced the running of the limitations period in a case brought under 42 U.S.C. § 2000e-16 against the federal government, the Supreme Court stated, "[u]nder our system of representative litigation, 'each party is deemed bound by the acts of his lawyer-agent and is considered to have "notice of all facts, notice of which can be charged upon the attorney."'" Irwin v. Department of Veterans Affairs, 498 U.S. 89, 92 (1991) (citing Link v. Wabash R. Co., 370 U.S. 626, 634 (1962) (quoting Smith v. Ayer, 101 U.S. 320, 326 (1880))). This court sees no principled reason to make the distinction between "receipt" in cases brought against the federal government under 42 U.S.C. § 2000e-16 and those brought against a non-federal employer under 42 U.S.C. § 2000e-5.

    The plaintiff has, however, filed an affidavit that creates a genuine issue of material fact on the issue of whether the EEOC knew that the plaintiff was not being represented by counsel. Allegedly, one year before the right to sue letter was issued, the plaintiff informed the EEOC that Ms. Sanders was no longer her attorney in the matter. According to the plaintiff and, as luck would have it, a mere five days before the right to sue letter was issued, the plaintiff communicated to the EEOC that Ms. Mu'Min was no longer representing her. Although this appears nowhere in the log book of the EEOC, and, as with all of the material in Craig's affidavit, there exists absolutely no corroborative evidence of the plaintiff's conversation, the court is obligated to conclude that a genuine issue of material fact has been raised.

    Although a reasonable trier of fact might find that the plaintiff had filed her complaint in ample time, it could not find that the plaintiff had filed her charge with the EEOC within the required 180 day period. JCCEO claims that the plaintiff failed to file

her charge with the EEOC until March 24, 1993, over three years from the date she claims that Cunningham propositioned her. The plaintiff contends, relying on a statement in her affidavit, that she filed her charge with the EEOC on December 2, 1992. As with all of the plaintiff's assertions in her affidavit, there exists no corroborative evidence. Craig was required to file her charge with the EEOC within 180 days of the discriminatory act. With respect to quid pro quo, the incident of harassment is not confined to the propositioning of the plaintiff by the offender, but extends to the alleged actions taken by the offender in response to plaintiff's refusal to submit. It is therefore from the consequential act taken by the offender that the 180 day period begins running, not the moment that the offensive proposition is made. Nonetheless, the 180 day period had expired. The date on which Cunningham's alleged threat that she would have the plaintiff terminated was carried out on March 27, 1992 — the date the plaintiff was notified of her termination. See Delaware College v. Ricks, 449 U.S. 250, 257 (1980). Even if the court takes the plaintiff's contention that she filed her charge on December 2, 1992 to be supportable, her charge was filed with the EEOC impermissibly late.

The plaintiff claims that her discussions with an unnamed individual at the EEOC in March or April of 1992 support equitable tolling of the 180-day period. The plaintiff's contention that someone at the EEOC told her to await exhaustion of her remedies, as stated in her affidavit, is not only not verified, but, due to its vagueness, nearly unverifiable.[5] An allegation such as the plaintiff has made is not substantial enough to support an argument for equitable tolling.[6]

The plaintiff claims that she was subjected to both quid pro quo and hostile environment sexual harassment.

> "Quid pro quo sexual harassment occurs when an employer changes an employee's conditions of employment because of their (sic) refusal to submit to sexual demands." Virgo v. Riviera Beach Assocs., Ltd., 30 F.3d 1350, 1362 (11th Cir.1994) (citing Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1315 (11th Cir.1989)). Additionally, "an employer is strictly liable for quid pro quo sexual

---

[5] Nor is the statement capable of being disproved.

[6] The court notes that at least sometime earlier, plaintiff was represented by one or two attorneys.

> harassment." Faragher v. Boca Raton, 76 F.3d 1155, 1163. . . .
> To prove a prima facie case of quid pro quo sexual harassment, the employee must prove:
>> (1) the employee belongs to a protected group; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; and (4) the employee's reaction to the unwelcome behavior affected tangible aspects of the employee's compensation, or terms, conditions or privileges of employment.
>
> Virgo, 30 F.3d at 1361.

Brewer v. Petroleum Suppliers, Inc., 946 F. Supp. 926, 931 (N.D. Ala. 1996). The defendant states that the plaintiff cannot show the existence of quid pro quo sexual harassment; first, because the time between the alleged propositioning of the plaintiff and any retaliatory action is too attenuated and, second, because Cunningham did not have the power to terminate the plaintiff, only to recommend termination. The plaintiff responds that Cunningham began reprimanding the plaintiff immediately after the plaintiff declined Cunningham's alleged request that the plaintiff sleep with her. Also, the plaintiff contends that Cunningham had the power to reprimand the plaintiff, to temporarily remove her from work and to recommend termination and used that power against the plaintiff after the alleged incident of harassment. Although the court realizes that the plaintiff has stated a possible quid pro quo claim, such claim is barred by the limitations period.

The plaintiff also claims hostile work environment sexual harassment:

> A plaintiff can establish a violation of Title VII by proving that sexual discrimination has created a hostile or abusive work environment. Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66 [] (1986). The United States Supreme Court has explained: "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 [] (1993) (citing Vinson, 477 U.S. at 65, 67 []) (internal quotation marks omitted). Moreover, the Court noted that, "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." Harris, 510 U.S. at 23. An employer is directly liable for hostile environment sexual harassment if it knew, or reasonably should have known, of the harassment and failed to take prompt remedial actions. Faragher v. City of Boca Raton, 111 F.3d 1530, 1535, 1538 (11th Cir.1997) (en banc); Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316 (11th Cir.1989); Henson v. City of Dundee, 682 F.2d 897, 905 (11th Cir.1982).
> A plaintiff can prove that the employer had knowledge of the harassment by showing that she complained to higher management or by showing that the

> harassment was so pervasive that the employer can be charged with constructive knowledge of the harassment. *Faragher*, 111 F.3d at 1538; *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 904 (11th Cir.1988). The question of constructive knowledge is an issue of fact. *Faragher*, 111 F.3d at 1538, *Reich v. Department of Conservation and Natural Resources, Alabama*, 28 F.3d 1076, 1082 (11th Cir.1994). Moreover, "a court must evaluate the totality of the circumstances both in determining whether the work environment was abusive and in determining whether the conduct was pervasive enough to put the employer on notice." *Faragher*, 111 F.3d at 1538. In the instant action, plaintiff initially failed to complain of the harassment. When she did complain, [the defendant] took immediate action although a dispute exists as to how effective that action was. . . .
>
> The Supreme Court has provided a non-exclusive set of factors to consider in determining whether an environment is hostile. "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23 []. In determining whether harassment is so pervasive as to provide the employer with constructive knowledge, this Court recently held that, "[t]he question of notice to the employer is distinct from the question of the environment's abusiveness." *Faragher*, 111 F.3d at 1538. However, there may be cases where the same level of pervasiveness supports a finding of both a hostile environment and constructive notice. *Id.* n. 10. Some factors that this Court has considered in determining whether harassment was so pervasive as to provide constructive notice to an employer are: the remoteness of the location of the harassment as compared to the location of management; whether the harassment occurs intermittently over a long period of time; whether the victims were employed on a part-time or full-time basis; and whether there were only a few, discrete instances of harassment. *Id.* at 1538.

*Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646-47 (11th Cir. 1997). The harassment complained of in the present case is the alleged request by Cunningham that the plaintiff sleep with her. No other sexual overtures were apparently made or acted upon. The plaintiff alleges that she told one person, Judge Carol Smitherman, of the alleged statement, although Judge Smitherman denies that she was told anything. The plaintiff does not provide any indication of how her complaining to Judge Smitherman was a complaint to any JCCEO review board. In the absence of an explanation of Judge Smitherman's relation to the JCCEO and her ability to remedy the situation as a part of that entity, this court cannot find that the JCCEO was directly informed of the alleged harassment.

However, the court can find that the JCCEO is indirectly responsible for the

harassment. An employer may be held indirectly liable for a supervisor's harassment if the harassment is aided by his agency relationship with the employer. See Faragher v. City of Boca Raton, 111 F.3d 1530, 1537 (11th Cir.1997) (en banc). Cunningham allegedly attempted to use her capacity to affect the plaintiff's employment with JCCEO to get the plaintiff to sleep with her. This would be sufficient to support a finding of indirect liability. See Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1560 (11th Cir.1987). Nonetheless, the plaintiff's hostile environment claim is time-barred for the same reason as the quid pro quo claim: the last action taken by the JCCEO Board of Directors against the plaintiff was on March 27, 1992, over 180 days before she filed her charge with the EEOC.

The plaintiff states that as her termination is a result of her declining to sleep with Cunningham, she has a claim for retaliation.

> In a retaliation case such as this one, the plaintiff must show the following to establish a prima facie case: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action. Hairston, 9 F.3d at 919. Once the plaintiff has established a prima facie case of retaliation, "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." Hairston, 9 F.3d at 919. If the defendant proffers legitimate reasons, the presumption of retaliation is rebutted and drops from the case. At the summary judgment stage, the burden then shifts back to the plaintiff to raise a genuine factual issue as to whether the defendant's proffered reason is a pretextual ruse to mask a retaliatory action. See Hairston, 9 F.3d at 921 ("The burden to avoid summary judgment is not to show by a preponderance of the evidence that the stated reasons were pretext. Rather, plaintiff's burden . . . is met by introducing evidence that ... could allow a jury to find ... that the plaintiff has established pretext, and that the action was taken in retaliation for engaging in the protected activity.").

Raney v. Vinson Guard Service, 120 F.3d 1192, 1195-96 (11th Cir. 1997). Plaintiff rebuffed Cunningham's alleged offer to sleep with her and within a brief period, the plaintiff began to receive reprimands, to be removed from work and to be subject to recommendations of termination by Cunningham. Even assuming that the plaintiff's claim arises from her reporting her claim to Judge Smitherman and retaliatory action being taken on the basis of the report, the last action taken against the plaintiff was on June 17, 1992. The claim is, like the plaintiff's quid pro quo claim, time-barred, even if it were viable.

-11-

In addition to her Title VII claims, the plaintiff contends that, in being terminated, she suffered a breach of contract in violation of Alabama law. The defendant contests this, arguing that the plaintiff is terminable at will and therefore can be fired for any cause or no cause at all. The plaintiff disagrees, pointing to a section of the employment handbook which states:

> An employee must justify his/her complaint on the proper basis. Thus, for example, an employee cannot justify a grievance on the basis of discrimination since discrimination is the basis for a Civil Rights complaint. Each of the three redress procedures by definition addresses different circumstances, thereby necessitating that an employee substantiate his/her case as required by the redress procedure he/she selects. All complaints must receive full and fair hearing in accordance with Agency personnel policies and procedures. However, once the employee has filed his/her complaint through the proper redress channel, she/he must follow the Agency's established procedures and time frames or risk forfeiting his/her rights to relief through that procedure.
> <u>Failure of the Agency to properly follow its own established procedure leaves it vulnerable to a charge of violating the due process rights of the employee as well as funding source requirement</u>. It is the responsibility of the Board of Directors to ensure that the Agency follows adequate and proper redress procedures. The Board must establish mechanisms to monitor staff, policy council, or board committee actions in executing the redress procedures.
> <u>Once becoming knowledgeable of a procedural violation, the Board must act to correct the violation and assure its non-recurrence</u>. All grievance and appeal procedures must meet due process requirements as previously stated. Any deviation from the following procedures is a result of specific grant or contract requirements.

The plaintiff contends that the quoted language in the employee handbook gave rise to a limitation on the defendant's ability to terminate her and that the Board of Directors' failure to consider "Ms. Craig's circumstance" in approving her termination violated that contract right.

The defendant responds that the language does not create any contract rights, instead limiting the circumstances under which special grievance procedures may be had for an employee to those cases in which the employee is specifically granted those procedural rights or the rights are conferred through contract.

In <u>Hoffman-LaRoche, Inc., v. Campbell</u>, 512 So.2d 725, (Ala. 1987), the Alabama Supreme Court stated:

> By now, the rule is well settled in Alabama that an employee contract at will may be terminated by either party with or without cause or justification. See, e.g., Meeks v. Opp Cotton Mills, Inc., 459 So.2d 814 (Ala.1984); Hinrichs v. Tranquilaire Hospital, 352 So.2d 1130 (Ala.1977). This means a good reason, a wrong reason, or no reason. Hinrichs, supra.
> The cases reveal that three elements must be shown to establish that an employment contract is one other than one terminable at will: (1) that there was a clear and unequivocal offer of lifetime employment or employment of definite duration, Bates v. Jim Walter Resources, Inc., 418 So.2d 903 (Ala.1982); (2) that the hiring agent had authority to bind the principal to a permanent employment contract, Alabama Mills, Inc. v. Smith, 237 Ala. 296, 186 So. 699 (1939); and (3) that the employee provided substantial consideration for the contract separate from the services to be rendered, United Security Life Ins. Co. v. Gregory, 281 Ala. 264, 201 So.2d 853 (1967). This Court has repeatedly refused to modify this doctrine even so much as to recognize a so-called public policy exception to its application. Thus, we have refused to recognize an exception where an employee had been dismissed for refusing to commit a criminal act, see, e.g., Jones v. Ethridge, 497 So.2d 1107 (Ala.1986); Williams v. Killough, 474 So.2d 680 (Ala.1985), or where an employee had been dismissed because he filed a workmen's compensation claim, see Meeks v. Opp Cotton Mills, Inc., supra, or where an employee had been dismissed because he responded to a subpoena for jury duty, see Bender Ship Repair, Inc. v. Stevens, 379 So.2d 594 (Ala.1980).

The court does not see how the provision relied on by the plaintiff gives rise to any substantive rights at all. The procedures laid out in the contract were meant to insure that an employee who is the subject of an arbitrary or unwelcome decision at the hands of a supervisor or the Policy Council can have the decision reviewed at a higher level. There is no assurance in the handbook that the Board of Directors is not permitted to dismiss the employee in an equally summary fashion, so long as it complies with its procedures. The Board of Directors can uphold a termination occurring for no cause at all. Therefore, even if the Board of Directors affirmed the termination of the plaintiff without a searching investigation of the cause of her termination, there is no contract violation.

The plaintiff finally claims that she is entitled to pay for the period from October 25, 1991 to December 14, 1991. Allegedly, after the plaintiff was permitted to return to work with back pay on November 26, 1991, JCCEO only paid the plaintiff for the time reaching from September 14, 1991, the date of her suspension, until October 25, 1991. The defendant responds that the JCCEO only reinstated her with backpay until October 25, 1991, the date of the alleged incident in which the plaintiff allegedly ran a co-

employee off of interstate 65. Because she received a second suspension with respect to that incident, JCCEO claims, backpay was not required to be given for events subsequent to October 25, 1991. The plaintiff was eventually terminated on events allegedly arising out of this incident. It was within the JCCEO's discretion whether on not to award backpay. The plaintiff's backpay claim will be dismissed.

## Conclusion

For the foregoing reasons, the defendant's motion for summary judgment will be GRANTED. This cause will be DISMISSED, with prejudice.

This 14TH day of November 1997.

*/s/ Robert B. Propst*
ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE